Slip Op. 07-113

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                 :
WUHAN BEE HEALTHY CO., LTD.      :
and PRESSTEK INC.,               :
                                 :
            Plaintiffs,          :
                                 :
        v.                       :  Before: Richard K. Eaton, Judge
                                 :
UNITED STATES,                   :  Court No. 05-00438
                                 :
            Defendant,           :
                                 :
        and                      :
                                 :
THE AMERICAN HONEY PRODUCERS     :
ASSOCIATION OF AMERICA and       :
THE SIOUX HONEY ASSOCIATION,     :
                                 :
            Deft.-Ints.          :
_____:
```

OPINION AND ORDER

[United States Department of Commerce's Final Results sustained in part and remanded.]

Dated: July 20, 2007

*Kalik Lewin* (*Martin J. Lewin* and *Brenna Steinert Lenchak*), for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*); Office of the Chief Counsel of Import Administration, United States Department of Commerce (*Douglas S. Ierley*), of counsel, for defendant.

*Kelley Drye Collier Shannon* (*Michael J. Coursey* and *R. Alan Luberda*), for defendant-intervenors.

Eaton, Judge:  Before the court is the Rule 56.2 motion for judgment upon the agency record of plaintiffs Wuhan Bee Healthy Co., Ltd. ("Wuhan Bee") and Presstek Inc. ("Presstek") (collectively, "plaintiffs").  *See* Pls.' Br. Supp. Mot. J. Agency R. ("Pls.'s Mem.").  Defendant United States and defendant-intervenors The American Honey Producers Association and The Sioux Honey Association oppose the motion.  *See* Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Opp'n"); Def.-Ints.' Br. Opp'n Pls.' Mot. J. Agency R. ("Def.-Ints.' Opp'n").  By their motion, plaintiffs challenge certain aspects of the final results of the United States Department of Commerce's ("Commerce" or the "Department") second administrative review of the antidumping duty order on honey from the People's Republic of China ("PRC") for the period of review, December 1, 2002, through November 30, 2003 ("POR").  *See* Honey from the PRC, 70 Fed. Reg. 38,873 (Dep't of Commerce July 6, 2005) (final results) and the accompanying Issues and Decision Memorandum (June 27, 2005), Pub. Doc. 341 ("Issues & Dec. Mem.") (collectively, "Final Results").  Jurisdiction is had pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the reasons that follow, the court sustains the Final Results in part and remands this case to Commerce for further action consistent with this opinion.

BACKGROUND

Plaintiffs Wuhan Bee and Presstek are, respectively, a producer and exporter of honey from the PRC, and a honey importer and distributor in the United States.  During the POR, Wuhan Bee exported honey from the PRC (the "subject merchandise") to its affiliate Presstek, which in turn sold the honey to Pure Sweet Honey ("PSH"), an affiliated honey blender.[1]  PSH then blended plaintiffs' merchandise with honey from other countries and resold it to unaffiliated customers in the United States.

On December 2, 2003, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order on honey from the PRC.  *See* Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 68 Fed. Reg. 67,401 (Dep't of Commerce Dec. 2, 2003) (notice). Pursuant to the notice, Wuhan Bee asked for a review of its entries during the POR.  *See* Honey From the PRC, 69 Fed. Reg. 77,184 (Dep't of Commerce Dec. 27, 2004) (prelim.).  Commerce initiated the second administrative review on January 22, 2003. *See* Initiation of Antidumping and Countervailing Duty Admin. Revs. and Req. for Revocation in Part, 68 Fed. Reg. 3009 (Dep't

---

[1]     Commerce found Wuhan Bee was affiliated with Presstek for a part of the POR, i.e., from July 20, 2003, forward. Presstek and PSH were affiliated during the entire POR.  *See* Issues & Dec. Mem. at 68.

of Commerce Jan. 22, 2003) (notice).


During the course of its review, Commerce issued
questionnaires to Wuhan Bee asking for information concerning,
among other things, its sales to the United States (Section C);
factors of production (Section D); and costs associated with
further manufacturing in the United States (Section E).  Commerce
also issued supplemental questionnaires to Wuhan Bee, which
focused on its calculation of "blend ratios."[2]  That is, by these
supplemental questionnaires, Commerce sought to determine the
percentage of Wuhan Bee's honey contained in each sale of blended
honey made by PSH to unaffiliated U.S. customers.  As Commerce
noted in the Final Results, blend ratios are "essential to the
reported U.S. sales and further manufacturing databases because
the ratios determine whether a particular honey sale is of
subject or non-subject merchandise and the quantity of the sale
of subject merchandise."  Issues & Dec. Mem. at 80.


Commerce notified Wuhan Bee that it would verify its
questionnaire responses pertaining to U.S. sales made through

---

[2]     Wuhan Bee first identified "blend ratios" in its
Section C response as "the percentage of subject honey contained
within the honey resold by Wuhan Bee's U.S. affiliate . . . ."
Wuhan Bee's Sec. C Ques. Resp., Conf. Doc. 13 at 25 (adding field
30.1 "BLENDRATU (%)" to the fields Commerce requested Wuhan to
include in its U.S. sales database).

Court No. 05-00438                                              Page 5

Presstek and PSH between July 20, 2003 and the end of the POR,

in the United States offices of PSH.[3]  Verification was scheduled

for April 27, 2005, to April 29, 2005.


    Prior to verification, Commerce forwarded to Wuhan Bee an

outline indicating the areas to be covered, e.g., "Sales Process

and Sales Traces" and "Further Manufacturing," and the type of

documentation that it would require in order to verify the

information in Wuhan Bee's questionnaire responses.  *See* CEP

Verification Outline (Apr. 20, 2005), Conf. Doc. 101 at 7, 9.  In

particular, Commerce asked Wuhan Bee to be prepared to provide

"[d]ocumentation supporting the 'blend ratio,'" so that the

verifiers could trace data from documents to the responses.  CEP

Verification Outline, Conf. Doc. 101 at 8.  It also instructed

Wuhan Bee to "[p]lease be prepared to demonstrate the blend ratio

for all sales . . . and provide support documentation for all

costs associated with further manufacturing . . . as reported in

your questionnaire responses."  CEP Verification Outline, Conf.

Doc. 101 at 9.


    At verification, Commerce selected fifty-one U.S. sales

invoices for review from Wuhan Bee's U.S. sales databases.

---

    [3]    Presstek and PSH shared a physical address in Verona,
Wisconsin.  *See* Verification of U.S. Sales and Further
Manufacturing Expenses for Wuhan Bee, Conf. Doc. 106 at 1 n.2.

Twenty-six of the invoices were selected from a database
providing information about sales of subject and non-subject
merchandise during the POR.  For five of the twenty-six invoices,
company officials failed to provide supporting documentation.  As
for the other twenty-one invoices, Commerce found discrepancies
in blend ratios in three of them.  The remaining twenty-five
invoices were selected from a database that quantified the
differences between the amount of subject merchandise sold by
Wuhan Bee to its affiliates and the amount of subject merchandise
in the blended honey sold to unaffiliated U.S. customers.  For
nine of the twenty-five invoices, company officials were unable
to provide supporting documentation, and for the remaining
sixteen, Commerce found discrepancies with respect to the
reported blend ratios/blend content for thirteen of the invoices.
*See* Verification Rep., Conf. Doc. 106 at 3.


     On May 19, 2005, plaintiffs filed a brief with Commerce
("Case Brief") in an attempt to correct deficiencies in blend
ratios discovered at verification.  Commerce rejected an
attachment to the Case Brief and the narrative references to the
attachment, claiming they were "new information" that was
untimely filed and thus could not be verified.  Plaintiffs were
given an opportunity to submit a redacted version of the Case
Brief, i.e., one with the claimed untimely new information

omitted, which they did on May 24, 2005.  *See* Letter from
Commerce to Bruce M. Mitchell of 5/23/05, Conf. Doc. 113; *see
also* Letter from Bruce M. Mitchell to Commerce of 5/24/05, Conf.
Doc. 116.

On July 6, 2005, Commerce published notice of the Final
Results.  *See* Honey from the PRC, 70 Fed. Reg. at 38,873.  In the
Final Results, Commerce applied adverse facts available ("AFA")
to sales made by Wuhan Bee through affiliated parties in the
United States, i.e., Presstek and PSH, after July 20, 2003, and
assigned an antidumping duty rate of 183.80% to those sales.
Issues & Dec. Mem. at 82.

By their motion, plaintiffs challenge Commerce's decision to
use AFA.  They also challenge Commerce's valuation of the factors
of production of the subject merchandise (in particular, raw
honey and labor) and Commerce's calculation of surrogate
financial ratios, i.e., the cost of factory overhead; selling,
general and administrative expenses; and profit.  Finally, they
challenge Commerce's decision to change the methodology it used
to calculate the assessment rate and cash deposit rate from an *ad
valorem* basis to a per kilogram basis.

## STANDARD OF REVIEW

The court reviews the Final Results under the substantial evidence and in accordance with law standard, set forth in 19 U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citations & quotation marks omitted).

The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The court "must affirm [Commerce's] determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from [Commerce's]

conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345,
1352 (Fed. Cir. 2006) (internal quotation marks & citation
omitted).  In addition, "[a]s long as the agency's methodology
and procedures are reasonable means of effectuating the statutory
purpose, and there is substantial evidence in the record
supporting the agency's conclusions, the court will not impose
its own views as to the sufficiency of the agency's investigation
or question the agency's methodology." *Ceramica Regiomontana,
S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966
(1986), *aff'd*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (citing
*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S.
837, 843 (1984)).

DISCUSSION

I.   Commerce's Use of Facts Available/Adverse Facts Available
     with respect to Wuhan Bee's U.S. Sales

     In determining whether the subject merchandise is being, or
is likely to be, sold at less than fair value, 19 U.S.C.
§ 1677b(a) requires Commerce to make "a fair comparison . . .
between the export price or constructed export price and normal
value."  Because a portion of Wuhan Bee's U.S. sales during the
POR were made through its U.S. affiliates, Presstek and PSH,
Commerce compared the "constructed export price" of the subject

merchandise to normal value.[4]  "Constructed export price" is

"the price at which the subject merchandise is first sold . . .

in the United States . . . by or for the account of the producer

or exporter of such merchandise or by a seller affiliated with

the producer or exporter, to a purchaser not affiliated with the

producer or exporter," as adjusted.  19 U.S.C. § 1677a(b).


In this case, the first sale of Wuhan Bee's honey to an

unaffiliated U.S. purchaser was made through PSH after it had

blended Wuhan Bee's honey with honey from other sources.  The

"blend ratios" for the sales Wuhan Bee made through PSH, i.e.,

the percentage of subject merchandise in each sale, were an

important element in the calculation of constructed export price.

In the Final Results, Commerce found that many of Wuhan Bee's

reported blend ratios could not be verified as accurate.  Issues

& Dec. Mem. at 79 ("Of the invoices that we reviewed at

verification, 43 percent failed to be verified as accurate.

Thus, the Department determines that Wuhan Bee's reported blend

ratios cannot be verified.").


Where a respondent in an administrative review provides

information that Commerce cannot verify, the Department is

---

[4]     Commerce's construction of normal value is discussed
*infra* in Part II.

permitted to "fill[] gaps in the record" using facts otherwise

available.  Statement of Administrative Action, H.R. Doc. No.

103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040,

4198-99 ("SAA").  The relevant section of the antidumping duty

statute, 19 U.S.C. § 1677e, requires Commerce to determine (1)

whether to use facts otherwise available; and, if reliance on

such facts is warranted, (2) whether to use an adverse inference

in selecting from among the facts otherwise available.  First,

under subsection 1677e(a):

> If——
>> (1) necessary information is not
>> available on the record, or
>>
>> (2) an interested party or any
>> other person——
>>
>>> (A) withholds information
>>> that has been requested
>>> by [Commerce] . . .
>>> under this subtitle,
>>>
>>> (B) fails to provide such
>>> information by the
>>> deadlines for submission
>>> of the information or in
>>> the form and manner
>>> requested . . .,
>>>
>>> (C) significantly impedes
>>> a proceeding under this
>>> subtitle, or
>>>
>>> (D) provides such
>>> information but the
>>> information cannot be
>>> verified as provided in
>>> section 1677m(i) of this

title,[5]

> [Commerce] . . . shall, subject to section
> 1677m(d) of this title, use the facts
> otherwise available in reaching the
> applicable determination under this subtitle.

19 U.S.C. § 1677e(a).  As the Court of Appeals for the Federal

Circuit has held:

> The focus of subsection (a) is respondent's
> *failure to provide information*.  The reason
> for the failure is of no moment.  The mere
> failure of a respondent to furnish requested
> information—for any reason—requires Commerce
> to resort to other sources of information to
> complete the factual record on which it makes
> its determination.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed.

Cir. 2003) (emphasis in original).  Thus, subsection (a) mandates

the use of facts otherwise available when a respondent provides

Commerce with information that "cannot be verified."  19 U.S.C.

§ 1677e(a)(2)(D).


Once it determines that the use of facts otherwise available

is required, Commerce, in some circumstances, may use an

inference that is adverse to the interests of the respondent in

selecting from the facts on the record.  Pursuant to subsection

---

[5]     Subsection 1677m(i) requires Commerce to verify all
information relied upon in reaching its final results under 19
U.S.C. § 1675(a), if (1) verification is timely requested by an
interested party; and (2) no verification was made during the two
immediately preceding reviews of the same order.  *See* 19 U.S.C.
§ 1677m(i)(3)(A)-(B).

1677e(b):

> If [Commerce] . . . finds that an interested
> party has failed to cooperate by not acting
> to the best of its ability to comply with a
> request for information from
> [Commerce] . . ., [Commerce] . . ., in
> reaching the applicable determination under
> this subtitle, may use an inference that is
> adverse to the interests of that party in
> selecting from among the facts otherwise
> available.

19 U.S.C. § 1677e(b).  The *Nippon Steel* Court stated that, as

distinguished from subsection (a),

> subsection (b) permits Commerce to "use an
> inference that is adverse to the interests of
> [a respondent] in selecting from among the
> facts otherwise available," only if Commerce
> makes the separate determination that the
> respondent "has failed to cooperate by not
> acting to the best of its ability to comply."
> The focus of subsection (b) is respondent's
> *failure to cooperate to the best of its*
> *ability*, not its failure to provide requested
> information.

*Nippon Steel*, 337 F.3d at 1381 (quoting 19 U.S.C. § 1677e(b))

(emphasis and alteration in original).  "[T]he statutory mandate

that a respondent act to 'the best of its ability' requires the

respondent to do the maximum it is able to do."  *Id.* at 1382.


    Determining whether a respondent did the maximum it was able

to do to comply with Commerce's requests involves both objective

and subjective inquiries.  First, Commerce must make "an

objective showing that a reasonable and responsible importer

would have known that the requested information was required to

be kept and maintained under the applicable statutes, rules, and regulations." *Nippon Steel*, 337 F.3d at 1382 (citation omitted). Second, Commerce must make a subjective showing that the respondent not only has failed promptly to produce the requested information, "but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Id.* at 1382-83.

Finally, for the court to sustain the application of AFA, Commerce must "articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information [was] of significance to the progress of its investigation." *Mannesmannrohren-Werke AG v. United States*, 23 CIT 826, 839, 77 F. Supp. 2d 1302, 1313-14 (1999).

In the Final Results, Commerce concluded that the use of facts available was required for Wuhan Bee's U.S. sales to its affiliates because its reported blend ratios could not be verified as accurate.  Issues & Dec. Mem. at 79.  Further, Commerce found that resort to facts available was appropriate "[b]ecause Wuhan Bee did not inform the Department that its blend ratios were not accurate until the Department discovered the fact

at verification . . . ."  *Id*. at 80; *see* SAA at 869, 1994

U.S.C.C.A.N. at 4198 ("[Subsection 1677e(a)] requires

Commerce . . . to make determinations on the basis of the facts

available where requested information is missing from the record

or cannot be used because, for example, it has not been provided,

it was provided late, or Commerce could not verify the

information.").  In addition, because this discovery was made at

verification, Commerce found that it "did not have the

opportunity to allow Wuhan Bee to correct its deficient data,"

pursuant to 19 U.S.C. § 1677m(d).  *Id*.


     Next, Commerce used an adverse inference in selecting from

among the facts available because it concluded that Wuhan Bee had

failed to act to the "best of its ability," i.e., failed to do

the maximum it was able to do, to produce documents related to

reported blend ratios:

> Wuhan Bee had sufficient opportunity to
> inform the Department that its blend ratios
> were not accurate, yet as late into the
> proceeding as March 15, 2005, respondent
> asserted on the record just the opposite —
> that its blend ratios were accurate and could
> be easily verified. . . .  [R]espondent's own
> letters to the Department in December 2004
> and March 2005, addressing various issues
> regarding the blend ratios and further
> manufacturing cost, make it clear that
> respondent knew how important and central
> these ratios were to the Department's
> ultimate margin calculations.  Nevertheless,
> the Department gave respondent appropriate
> notice in its verification outline that it

> would be verifying respondent's blend ratios
> and that respondent should "be prepared to
> demonstrate the blend ratio for all
> sales . . . and provide supporting
> documentation for all costs associated with
> further manufacturing." . . .
>
> At verification, the Department discovered
> that the blend ratios were not accurate, at
> least not with the documentation that
> respondent was prepared to show the
> Department.  Only at this time did respondent
> claim that the ratios could not be verified.
> Wuhan Bee hindered the calculation of
> accurate dumping margins in this review
> because it was not more forthcoming about the
> problems and issues surrounding the reporting
> of the blend ratios, even though the issue
> was discussed numerous times throughout this
> proceeding.

Issues & Dec. Mem. at 81.  In other words, Commerce concluded

that Wuhan Bee failed to put forth its maximum effort by failing

to inform Commerce of problems surrounding its ability to

accurately report blend ratios and by representing that the blend

ratios were accurate and could easily be verified.


    Plaintiffs do not challenge the propriety of Commerce's

decision to resort to facts available under 19 U.S.C. § 1677e(a).

*See* Pls.' Mem. 32 (acknowledging "errors in the calculation of

blended ratios and the inability of PSH to fully comply with

Commerce's . . . document and reconciliation requests").

Plaintiffs do, however, challenge Commerce's decision to take an

adverse inference against Wuhan Bee in selecting from among the

facts available.

First, plaintiffs object to Commerce's decision to use AFA based on the finding that Wuhan Bee and its affiliates did not act to the best of their abilities.  They argue that Commerce failed to articulate why it concluded that a party failed to act to the best of its ability through a reasoned inquiry into the facts."  Pls.' Mem. 32.  Plaintiffs insist that the record does not support a finding "that Wuhan and its affiliates failed to cooperate fully with Commerce, or that the errors in blend ratio[s] were intended, or in fact, would have enabled Wuhan to obtain a more favorable result."  Pls.'s Mem. 32.

Plaintiffs argue that Commerce decided to apply AFA based on a presumption "that Wuhan was aware, or should have been aware, that some of the blend ratios it calculated were in error." Pls.' Mem. 21.  They claim this presumption is unreasonable and unfounded given the "commercial realities" of PSH's honey blending.  Pls.' Mem. 24.  In particular, plaintiffs contend that the record evidence shows that: (1) blending honey is an "art form," which is done according to customer preferences with respect to moisture content and color; (2) "honey is blended according to a plan recorded on . . . daily processing report[s]," which "do not specify the quantity or source of the honey barrels that enter into production"; and (3) "for commercial purposes, the amount of either subject or non-subject

merchandise is considered immaterial." Pls.' Mem. 23-24. As a result, for this review, Wuhan Bee manually reviewed documents to calculate blend ratios, since "PSH did not maintain blend ratios in the normal course of its record keeping," then reported the blend ratios in its section C and supplemental questionnaire responses. Pls.' Mem. 28.

For its part, defendant argues that "Commerce properly determined that [Wuhan Bee] and PSH failed promptly to produce or put forth the maximum effort to investigate and obtain the requested information" about blended honey sales. Def.'s Opp'n 12. Defendant insists that: (1) a reasonable importer would have known that the requested information was required to be kept and maintained, Def.'s Opp'n 15; and (2) Wuhan Bee failed to cooperate fully because it knew that blend ratios were a significant issue in Commerce's investigation and had notice that Commerce would examine those ratios at verification, yet failed to put forth the maximum effort to investigate and obtain the requested information. Def.'s Opp'n 18-22.

The court finds that Commerce's application of AFA is justified. Although not explicitly identified as such, the first required finding under *Nippon Steel*, i.e., an objective inquiry, has been satisfied. The key to this inquiry is whether

plaintiffs' behavior has been reasonable and responsible.  As expressed in the Final Results, Commerce apparently found that plaintiffs were neither reasonable nor responsible in their record keeping and in representing that their questionnaire responses were accurate and could easily be verified.  Commerce further apparently found that a reasonable and responsible respondent would have brought any problems surrounding its supporting documentation to Commerce's attention before the verification.  These assumptions are consistent with the *Nippon Steel* Court's injunction that a reasonable importer "have familiarity with all of the records it maintains in its possession, custody, or control; and  . . . conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question . . . ."   *Nippon Steel*, 337 F.3d at 1382.

The second required finding, that Wuhan Bee failed to act to the best of its ability, has also been satisfied.  Based on correspondence between Wuhan Bee and Commerce, it is clear that Wuhan Bee recognized that blended honey sales and further manufacturing expenses were significant issues in this review and that the databases submitted in response to Commerce's questionnaires on these issues would be the subject of verification.  *See, e.g.*, Letter from Jeffrey S. Grimson to

Commerce of 12/3/04, Pub. Doc. 222 at 1, 2 (acknowledging that

Wuhan Bee was "unique among all honey respondents in that Chinese

honey sold by Wuhan Bee through its US affiliate is blended with

non-subject merchandise prior to sale to the first unaffiliated

U.S. customer"; "[Data submitted on further manufacturing]

represents the total cost of blending, including the non-subject

honey."). Indeed, it represented that its questionnaire

responses could be verified:

> Wuhan Bee's responses to the Department's
> questionnaires have been sufficiently
> complete and accurate for the Department to
> be able to complete its verification of PSH's
> resale prices and U.S. expenses, including
> further manufacturing expenses, when
> verification takes place . . . .

Letter from Bruce M. Mitchell to Commerce of 3/15/05, Conf. Doc.

96 at 13. Along with this representation, Wuhan Bee indicated

that it was reviewing its questionnaire responses. Letter from

Bruce M. Mitchell to Commerce of 3/15/05, Conf. Doc. 96 at 13 n.6

(stating that plaintiffs had found certain clerical errors in

their responses, but that "none . . . undermine[d] the overall

veracity of the submission"). It did not, however, bring to

Commerce's attention any problems affecting its ability to

accurately report blend ratios, nor did plaintiffs ask Commerce

for help in this regard.[6] On the contrary, it assured Commerce

_____

[6]     The argument that plaintiffs may not have kept records
of blend ratios in the normal course of business does not stand
                                          (continued...)

that "PSH's record keeping system . . . used to compile the blend

ratios reported in Sections C and E, conform to stringent

industry standards and are sufficiently precise to allow PSH to

trace the source of honey in its blends . . . ."  Letter from

Bruce M. Mitchell to Commerce of 3/15/05, Conf. Doc. 96 at 11.

Nonetheless, at verification, PSH's officials failed to produce

supporting documentation for twenty-eight percent of the invoices

Commerce selected for review.  Verification Rep., Conf. Doc. 106

at 3.  With respect to those invoices for which PSH supplied

supporting documentation, Commerce discovered inaccuracies forty-

---

[6](...continued)
in the way of Commerce's application of an adverse inference
because the "best of its ability" standard, particularly with
respect to a successive review,

> assumes that importers are familiar with the
> rules and regulations that apply to the
> import activities undertaken and requires
> that importers, to avoid a risk of an adverse
> inference determination in responding to
> Commerce's inquiries: (a) take reasonable
> steps to keep and maintain full and complete
> records documenting the information that a
> reasonable importer should anticipate being
> called upon to produce; (b) have familiarity
> with all of the records it maintains in its
> possession, custody, or control; and (c)
> conduct prompt, careful, and comprehensive
> investigations of all relevant records that
> refer or relate to the imports in question to
> the full extent of the importers' ability to
> do so.

*Nippon Steel*, 337 F.3d at 1382.  While the "best of its ability"
standard recognizes that mistakes sometimes occur, it "does not
condone inattentiveness, carelessness, or inadequate record
keeping."  *Id.*

three percent of the time.  *See* Issues & Dec. Mem. at 79;
Verification Rep., Conf. Doc. 106 at 3.  That the errors in blend
ratios may not have been intended is not relevant to Commerce's
decision to take an adverse inference.  *Nippon Steel*, 337 F.3d at
1383 ("While intentional conduct, such as deliberate concealment
or inaccurate reporting, surely evinces a failure to cooperate,
the statute does not contain an intent element.  'Inadequate
inquiries' may suffice.  The statutory trigger for Commerce's
consideration of an adverse inference is simply a failure to
cooperate to the best of respondent's ability, regardless of
motivation or intent.").  Commerce's subjective inquiry, then,
focuses on plaintiffs' "fail[ure] to put forth [their] maximum
efforts to investigate and obtain the requested information from
[their] records."  *Id*. at 1382-83.


        Finally, plaintiffs make the argument that the Case Brief as
originally submitted, i.e., with the attachment, confirmed that
the errors in blend ratios that Commerce discovered at
verification did not result in any advantage to Wuhan Bee.  That
is, Wuhan Bee insists that it "[did] not obtain a more favorable
result by failing to cooperate than if it had cooperated fully."
Pls.' Mem. 31 (internal quotation marks & citation omitted).
Commerce may take an adverse inference to induce compliance with
its requests, and, indeed, to ensure that uncooperative

respondents do not receive a benefit as a result. *See Timken Co.*
*v. United States*, 354 F.3d 1334, 1345 (Fed. Cir. 2004).
Commerce's decision whether or not to take an adverse inference,
however, does not turn on whether Wuhan Bee's failure to comply
with Commerce's requests resulted in any advantage to it.  That
Wuhan Bee did not comply to the best of its ability is enough to
trigger the use of an adverse inference. *Nippon Steel*, 337 F.3d
at 1381.  Moreover, to the extent plaintiffs argue that Wuhan Bee
did not "intend" the errors in blend ratios, this argument is
immaterial because intent is not relevant to Commerce's decision
to use AFA.  *Id.* at 1383 ("The statutory trigger for Commerce's
consideration of an adverse inference is simply a failure to
cooperate to the best of respondent's ability, regardless of
motivation or intent.").  It may be true, as plaintiffs contend,
that the Case Brief and the attachment did not contain new
information, but rather a resorting of information that had been
verified. *See* Pls.' Mem. 30-32.  Nonetheless, because the sole
purpose of the attachment to the Case Brief was to show that "any
differences between 'precise' quantities sold and 'actual'
quantities reported would not have [had] an advantageous impact
on Wuhan Bee's margins," Case Brief, Conf. Doc. 113, Attach. 1 at
20, Commerce's rejection of the attachment and narrative
references thereto, if in error, was harmless error.

In light of the foregoing, Commerce justifiably found that a reasonable importer would have known that blend ratios were an important issue in this investigation and that the questionnaire responses, and the documents to support the responses, with respect to such ratios would be subject to verification. Commerce also reasonably concluded that Wuhan Bee was aware that the mix of subject and nonsubject merchandise in U.S. sales would be the subject of inquiry by Commerce at verification. Furthermore, Wuhan Bee's failure to maintain adequate records of blended honey sales and to bring any of the documentary problems to Commerce's attention prior to verification justified Commerce's finding that Wuhan Bee failed to do the maximum it was able to do.  The court thus sustains Commerce's use of AFA.


II.  Commerce's Construction of Normal Value

Next, the court turns to plaintiffs' challenges to Commerce's construction of normal value under 19 U.S.C. § 1677b(c)(1).  When merchandise that is the subject of an antidumping investigation is exported from a nonmarket economy ("NME")[7] country, such as the PRC, Commerce generally determines

---

[7]    A "nonmarket economy" country is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).  "Because it deems China to be a nonmarket economy country, Commerce generally considers
                                          (continued...)

its normal value by valuing the factors of production used in

producing the merchandise to which it adds "an amount for general

expenses and profit plus the cost of containers, coverings, and

other expenses." 19 U.S.C. § 1677b(c)(1). Factors of production

include the quantities of raw materials consumed and the hours of

labor needed to produce the subject merchandise. *See* 19 U.S.C.

§ 1677b(c)(3).

Commerce is directed to use "the best available information

regarding the values of such factors in a market economy country

or countries considered to be appropriate by the administering

authority." 19 U.S.C. § 1677b(c)(1). What constitutes best

available information is not defined by statute or regulation,

but Commerce normally considers the quality, specificity and

contemporaneity of the data and prefers to use public, country-

wide data, where it is available. *See Goldlink Indus. Co. v.

United States*, 30 CIT __, __, 431 F. Supp. 2d 1323, 1337 (2006);

Freshwater Crawfish Tail Meat from the PRC, 66 Fed. Reg. 20,634

(Dep't of Commerce Apr. 24, 2001) (notice), Issues and Decision

---

[7](...continued)
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT __,
__, 318 F. Supp. 2d 1339, 1341 (2004). Therefore, since the
subject merchandise came from the PRC, Commerce constructed
normal value by valuing the factors of production using surrogate
data from India. *See* 19 U.S.C. § 1677b(c)(4).

Mem., cmt. 2.


A.   Valuation of the Factors of Production

Plaintiffs dispute Commerce's decision as to what constitutes the "best available information" to value: (1) raw honey; and (2) labor costs.


1.   Raw Honey

In the Final Results, Commerce valued raw honey using data submitted by plaintiffs from a Web site maintained by EDA Rural Systems Pvt. Ltd., an organization that provides business development services to the honey and beekeeping sector in India ("EDA Data").  *See* Factors of Production Valuation Mem. for the Final Results, Pub. Doc. 340, Attach. I.  Based on this information, Commerce derived an average price for raw honey of 74.90 Rupees per kilogram during the POR.  *See* Factors of Production Valuation Mem. for the Final Results, Pub. Doc. 340 at 2.


Commerce decided to use EDA Data exclusively in valuing raw honey.  In doing so, it rejected three articles also submitted by plaintiffs, which contained different values of honey, from: (1)

*Hindu Business Line*;[8] (2) *Indiainfoline*;[9] and (3) *Indian Express*.[10]  Plaintiffs argue that the values contained in the three articles should be averaged with the value of honey found in the EDA Data.

In the Final Results, Commerce explained its decision to value raw honey using just the EDA Data: "[T]he EDA Data . . . constitute[s] a[n] . . . appropriate surrogate value source for this POR.  [It is] . . . the best information currently available because it is publicly available, quality data, specific to the raw honey beekeeping industry in India, and contemporaneous with the POR."  Issues & Dec. Mem. at 10.  With respect to quality, Commerce found that "the EDA Data source is highly documented, including numerous specific price points over a six year period for multiple types of honey from many suppliers, and includes detailed information on production, inputs, and beekeepers."  *Id.* at 11.  With respect to specificity, Commerce noted that "the prices quoted in the EDA Data are specific to the raw honey beekeeping industry in the state of Bihar in India."  *Id.*  With

_____

[8]     "Girijan co-op targets Rs 135-cr turnover" (dated Apr. 17, 2003).

[9]     "Prospects of Bee Keeping in Rubber Plantations of Kerala" (dated Sept. 2, 2003).

[10]    "In Jharkhand, it's all about honey, honey" (dated Feb. 17, 2003).

respect to contemporaneity, Commerce found that the "EDA Data is

contemporaneous to this administrative review, . . . and it

includes monthly data points over a majority of the POR."  *Id*.

(footnote omitted).


In addition, Commerce addressed the reliability and

persuasiveness of the three other data sources proposed by

plaintiffs and rejected each one:

> [1] [T]he [*Hindu Business Line* article] . . .
> is not reliable because . . . the information
> is based on data provided by . . . an Indian
> cooperative, and represents the experience of
> only one producer; and . . . the Department
> has rejected this data in previous segments
> of this proceeding because it was not
> obtained from publicly available sources and
> may not be representative of country-wide
> prices in India. . . .
>
> [2] [T]he [*Indiainfoline* article] appears to
> be nothing more than a school paper written
> by a first-year business student and posted
> on the Business School section of the website
> with no additional information on the
> author's qualifications or the sources of his
> information. . . .
>
> [3] [T]he [*Indian Express* article] . . .
> states that the prices quoted are limited to
> a single beekeeper that only produces 1.5 MT
> per year, and . . . was rejected as
> unreliable [in a previous segment of the
> proceeding] . . . . [T]he exceptionally
> limited nature of [this] data renders [it]
> unpersuasive of Indian prices as a whole in
> comparison with the broader EDA Data.

Issues & Dec. Mem. at 13.

Plaintiffs do not quarrel with Commerce's use of the EDA Data.  Rather, they argue that Commerce's rejection of the other sources plaintiffs proposed was unreasonable.  According to plaintiffs, the three articles "covered different regions of India but showed a relatively narrow range of prices for raw honey . . . ."  Pls.' Reply Br. to Def.'s & Def.-Ints.' Resp. Brs. ("Pls.' Reply") 10.  Plaintiffs further maintain that the prices contained in the EDA Data are not representative of the price of honey found in India generally.  Pls.' Mem. 34; Pls.' Reply 9.  Thus, plaintiffs contend that "[a]s all information on the record is region-specific, the most reasonable method to arrive at a country-wide surrogate value is to calculate an average price derived from all this data . . . ."  Pls.' Mem. 37.

Plaintiffs therefore insist that "Commerce's reasons for rejecting [the *Hindu Business Line*, *Indiainfoline* and *Indian Express* articles] were arbitrary and capricious."  Pls.' Reply 9.

> Commerce rejected the [*Hindu Business Line* article] because the information related to a cooperative, while using the data from another cooperative, [Mahabaleshwar Honey Production Cooperative Society Ltd.], to determine financial ratios.  Commerce rejected the [*Indiainfoline* article] as it had concerns over the origins of the article written by a business student, but used the EDA Data, found on a random website. Further, Commerce relied upon articles published in . . . Indiainfoline . . . in other proceedings.  Finally, Commerce rejected [the *Indian Express* article] as it

> was limited to the results of a single
> beekeeper and had previously rejected this
> information before.  Yet, there is nothing to
> suggest that the price information in the
> article was unreliable.

Pls.' Reply 9.  Plaintiffs thus seek a remand with instructions

to value raw honey based on an average of the honey values found

in the *Hindu Business Line*, the *Indiainfoline* and the *Indian

Express* articles as well as the EDA Data.


In response, defendant contends that Commerce's explanations

for rejecting plaintiffs' proposed data are reasonable, and that

the record supports Commerce's decision not to average the honey

values:

> [T]he [*Hindu Business Line*, *Indiainfoline* and
> *Indian Express*] articles either quote prices
> from single producers, or contain data from
> unknown origins, which Commerce determined
> not to be comparable with the EDA data.
> Further Commerce "continue[d] to find that
> the [three articles] are unreliable sources
> for valuing honey." . . .
>
> In this case, the sources for the surrogate
> value of raw honey contained upon the record
> were all regionally limited.  EDA data are
> based upon the raw honey beekeeping industry
> in the second largest honey producing state
> in India, offering more representative prices
> than the article from <u>Indiainfoline</u>, the
> prices for which are from the Kerala region,
> which accounts for only nine percent of
> India's honey production.  In addition,
> Commerce rejected the articles from
> [Indiainfoline] and <u>Hindu Business Line</u>
> because they either quote prices from single
> producers, making them less representative
> than EDA data, or contain data from unknown

origins rather than from public sources,
unlike the EDA data.

Def.'s Opp'n 29 & 31.  Thus, defendant insists that, since the

alternative data sources proposed by plaintiffs were not

reliable, Commerce's decision not to average them with the EDA

Data is justified.


Commerce enjoys some latitude in selecting among the

available information in valuing the factors of production.  *See*

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed.

Cir. 1999).  In choosing from among the available data, Commerce

"must act in a manner consistent with the underlying objective of

19 U.S.C. § 1677b(c) – to obtain the most accurate dumping

margins possible."  *Shandong Huarong Gen. Corp. v. United States*,

25 CIT 834, 838, 159 F. Supp. 2d 714, 719 (2001) (citation

omitted); *Shakeproof Assembly Components, Div. of Ill. Tool*

*Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir.

2001)).  To determine whether Commerce's selection of surrogate

values furthers this statutory purpose, the court must determine

whether "Commerce's choice of what constitutes the best available

information evidences a rational and reasonable relationship to

the factor of production it represents."  *Shandong Huarong*, 25

CIT at 838, 159 F. Supp. 2d at 719 (citations omitted).


Here, the court finds reasonable Commerce's use of the EDA

Data and the exclusion of the other three sources proposed by
plaintiffs.  First, plaintiffs do not dispute the reliability of
the EDA Data.  Indeed, although now declaring the data as being
from a "random website," at the administrative level they argued
in favor of Commerce using it as a part of an average.  *See*
Issues & Dec. Mem. at 10.  Moreover, Commerce's decision not to
average the EDA Data with the three articles proposed by
plaintiffs was reasonable in light of the deficiencies Commerce
found in those sources.

First, Commerce was justified in rejecting the *Hindu
Business Line* article.  In a single sentence the article states a
range of prices received by a single producer, the Girijan Co-
operative Corporation Ltd.  *See Hindu Business Line* Article at 2.
The EDA Data, on the other hand, contains information on numerous
producers and therefore represents a wider range of prices.  In
addition, there is no indication that the sources of the data
contained in the *Hindu Business Line* article are publicly
available.  *See* Issues & Dec. Mem. at 12.

Second, the court finds no error in Commerce's conclusion
that the *Indiainfoline* article was unreliable.  Commerce found
that unlike the EDA Data, the sources of which were well-
documented and made available by a business entity, the

*Indiainfoline* article contained nothing to indicate it was
reliable.  In particular, there was "no additional information on
the author's qualifications or the sources of his information"
other than his status as a first-year business student.  *Id*. 12-
13.

        Third, the *Indian Express* article was found not to be as
representative as the EDA Data because it pertained to the
experience of only a single beekeeper.

        In light of the proposed sources' deficiencies, the court
finds reasonable Commerce's decision not to average this data
with the EDA Data, which Commerce found was (1) publicly
available; (2) well-documented, with numerous price points for
multiple types of honey from many suppliers; (3) detailed
information on production, inputs and beekeepers; (4) based on
India's second largest honey-producing region (Bihar); and (5)
contemporaneous with the POR.  Thus, Commerce's conclusion that
the EDA Data was the "best available information" on the record
on which to base its valuation of raw honey is supported by
substantial evidence and in accordance with law.

        2.   Labor Costs

        The cost of labor is another factor of production used to

construct normal value.  As this Court has observed, "Commerce
treats the wage rate differently from all other factors of
production[.] [F]or labor, Commerce employs regression-based wage
rates reflective of the observed relationship between wages and
national income in market economy countries."[11] *Dorbest Ltd. v.
United States*, 30 CIT __, __, 462 F. Supp. 2d 1262, 1291 (2006).
"Using this regression analysis, Commerce determines the
relationship between countries' per capita Gross National Product
[("GNI")] and their wage rates; Commerce approximates the wage
rate of the PRC by using the PRC's GNI as the variable in the
equation that was the result of the regression."  *Id*. at __, 462
F. Supp. 2d at 1291.

     Here, Commerce based its regression analysis upon the
average wages from a basket of fifty-six market economy

---

[11]     In full text, Commerce's regulation with respect to how
labor is to be valued in the nonmarket economy context provides:

> For labor, the Secretary will use regression-
> based wage rates reflective of the observed
> relationship between wages and the national
> income in market economy countries.  The
> Secretary will calculate the wage rate to be
> applied in nonmarket economy proceedings each
> year.  The calculation will be based on
> current data, and will be made available to
> the public.

19 C.F.R. § 351.408(c)(3) (2005).

countries.[12]  Factors of Production Valuation Mem. for the
Prelim. Results, Pub. Doc. 231, Attach. 14.  Therefore, after
making its calculation, it "use[d] the 2004-revised expected wage
rate of $0.93/hour as a surrogate for Chinese labor costs, in
accordance with its regulations and long-standing practice."
Issues & Dec. Mem. at 28.

Plaintiffs challenge Commerce's methodology for calculating
the surrogate wage rate, arguing that in determining which
countries make up the basket of fifty-six countries, Commerce
"selectively excluded many low wage countries and selectively
included non-comparable source countries."  Pls.' Mem. 41.  For
example, plaintiffs point out that Commerce included "source
countries, such as Switzerland, the U.K., Norway, and Germany,"
Pls.' Mem. 18, and excluded available data, which plaintiffs
placed on the record, for twenty-two additional countries, e.g.,
Albania, Bangladesh, Cambodia and the Czech Republic.  Pls.' Mem.
41; *see also* Letter from Bruce M. Mitchell to Commerce of
1/18/05, Ex. 5, Attach. 1, Pub. Doc. 257 (placing on the record
data for twenty-two countries); Case Brief dated May 10, 2005,

---

[12]     The basket of countries includes high-wage countries,
such as Switzerland ($18.24/hour); the United Kingdom
($15.11/hour); and the United States ($14.83/hour); and low-wage
countries, such as India ($0.15/hour); Pakistan ($0.26/hour); and
Sri Lanka ($0.30/hour).  Factors of Production Valuation Mem. for
the Prelim. Results, Pub. Doc. 231, Attach. 14.

Pub. Doc. 301 at 44 & n.16.  Commerce's exclusion of available
data, plaintiffs argue, was arbitrary and contrary to Commerce's
own position that "more data is better than less data."  Pls.'
Mem. 41.

    Plaintiffs also contend that in performing its regression
analysis, Commerce improperly combined data from 2001 (regarding
the wage rates and per capita GNI of the fifty-six market economy
countries) with data from 2002 (regarding Chinese GNI), when 2002
data was available with respect to the wage rates and per capita
GNI of the market economy countries.  Pls.' Mem. 17 (citing
arguments raised below in plaintiffs' Case Brief dated May 10,
2005, Pub. Doc. 301 at 38-39).  Plaintiffs charge that by mixing
Chinese GNI data from 2002 with wage rate and per capita GNI data
from 2001, Commerce violated its regulations which require use of
"current data."  Pls.' Mem. 41 (quoting 19 C.F.R.
§ 351.408(c)(3)).  Thus, plaintiffs argue, Commerce's methodology
"critically undermines any assertion that the regression based
wage calculation significantly enhances the accuracy and fairness
in the NME case."  Pls.' Mem. 41.

    Defendant responds that because "Commerce has consistently
based its regression analysis upon average wages from a basket of
56 countries since it updated its regression analysis in 2000,"

the twin aims of predictability and fairness are served by using this method of calculating wage rate.  Def.'s Opp'n 43.  In addition, Commerce insists that changing the methodology as plaintiffs propose, i.e., to add twenty-two countries to the basket currently compiled, is a significant change that would require comment from the general public, which would be impracticable in this review.  Def.'s Opp'n 43-44.

As to its wage rate finding, however, Commerce requests remand because it acknowledges that it "mistakenly relied upon income data from two different years [i.e., 2001 and 2002,] in its calculation of the surrogate wage rate."  Def.'s Opp'n 41. Thus, defendant asks the court to sustain its wage rate calculation methodology and to remand for the limited purpose of recalculating the labor wage rate using "the correct GNI data." Def.'s Opp'n 45.

The court cannot sustain Commerce's labor calculation.  When valuing factors of production, Commerce is required to use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate."  19 U.S.C. § 1677b(c)(1).  In the Final Results, Commerce rejected plaintiffs' request to recalculate the surrogate wage:

The Department is reviewing its regression-
based wage rate calculation . . .; however,
comprehensively re-examining each country in
the existing dataset and recalculating the
wage rate regression using GNI requires more
time than is currently available.  To revise
the data here would be impracticable given
the time constraints of this review.  The
Department is fully satisfied that the
current figures are reasonable and correct,
and will use them unless and until they are
changed as a result of a thorough review.
Recalculating the regression analysis using a
significantly different basket of countries
would amount to a significant change in the
Department's methodology; such a change
should be subject to notice and comment from
the general public.  Thus, it would be
inappropriate to restrict this public-comment
process to the context of the instant review.
Consequently, the Department will invite
comments from the general public on this
matter in a proceeding separate from the
current review of this order.

Issues & Dec. Mem. at 28.  In other words, Commerce declined to

revise the data set it relied upon in the Final Results because:

(1) it was impracticable under the statutory deadlines for

completing its investigation; and (2) recalculating the

regression analysis using a significantly different basket of

countries would likely result in a significant change in

methodology that would require comment from the public.  This

Court has rejected both of these arguments.


     In *Dorbest Ltd.*, the Court found wanting the argument that

statutory deadlines for completing investigations prevented

Commerce from considering available information in updating its

regression model:

> Congress was certainly sensitive to this
> concern [of completing investigations within
> statutory deadlines] by limiting Commerce's
> choice of data to that "available" during the
> investigation.  But in recognizing this
> concern, Congress nonetheless required that
> if information was available, i.e., placed on
> the record, Commerce was compelled to
> consider it.  Therefore, Commerce's defense
> runs directly against its statutory duty.
> Consequently, Commerce's . . . defense
> must . . . be rejected.

*Id.* at __, 462 F. Supp. 2d at 1296.  As to Commerce's past

practice of relying on data from fifty-six countries in making

PRC wage rate calculations and the need for public comment prior

to any change in that practice, the *Dorbest Ltd.* Court observed:

> Commerce's . . . argument . . . that the data
> set in question must be developed through
> notice-and-comment rulemaking[] appears to be
> inconsistent with Commerce's past practice.
> Commerce has in the past updated and expanded
> the number of countries within the data set
> without resorting to notice and comment
> rulemaking.  In fact, during the
> investigation here, Commerce used a basket of
> fifty-six countries, but during the voluntary
> remand, used a basket of only fifty-four.  No
> notice-and-comment rulemaking was used to
> effect the change.  Commerce has also, over
> time, expanded its data set of countries from
> forty-five countries to fifty-six countries
> without vetting its choices through notice-
> and-comment rulemaking.

*Id.* at __, 462 F. Supp. 2d at 1295.  The court agrees with the

*Dorbest Ltd.* Court's observations and likewise rejects Commerce's

arguments.[13]


In light of the foregoing, this matter is remanded so that
Commerce may consider the information plaintiffs have placed on
the record with respect to the twenty-two additional countries.
Further, Commerce must explain its decisions: (1) to exclude the
twenty-two low-wage countries with respect to which plaintiffs
placed information on the record; and (2) to include data from
high-wage countries, such as Switzerland, the United Kingdom and
the United States.  In the event that on remand Commerce rejects
the data from the twenty-two additional countries, it must
explain its decision with reference to specific evidence and
without reference to time constraints.  In addition, Commerce
must explain its decision to rely on a methodology that results
in the disparity observed between the hourly wage rate in, e.g.,
India ($0.15/hour), a market economy country found to be
economically comparable to the PRC, and the hourly wage rate

---

[13]    The court also notes that Commerce announced a revised
methodology in a notice published on October 19, 2006.  *See*
Antidumping Methodologies: Market Economy Inputs, Expected Non-
Market Economy Wages, Duty Drawbacks; and Request for Comments,
71 Fed. Reg. 61,716, 61,721-23 (Dep't of Commerce Oct. 19, 2006).
Under the revised methodology, the basket of countries "will
include data from all market economy countries that meet the
criteria described [in the notice] and that have been reported
within 1 year prior to the Base Year," which is the most recent
reporting year of the data required for the regression
methodology.  *Id*. at 61,722.

calculated for the PRC ($0.93/hour).[14]  *Dorbest Ltd.*, 30 CIT at
__, 462 F. Supp. 2d at 1269 ("For the court to conclude that a
reasonable mind would support Commerce's selection of the best
available information, Commerce needs to justify its selection of
data with a reasoned explanation.").

Finally, with respect to its request for voluntary remand to
revise its wage rate finding, Commerce is instructed to
recalculate the wage rate using the correct, most current GNI
data.  *See Allied Pac. Food (Dalian) Co. v. United States*, 30 CIT
__, __, 435 F. Supp. 2d 1295, 1309 (2006) (granting voluntary
remand instructing that "Commerce must support its findings of
fact concerning the surrogate value for the labor wage rate by
citing to specific evidence on the record and also must include
an explanation for the choices it makes from among the various
alternatives it considers").

B.   Surrogate Financial Ratios

In accordance with the requirement under 19 U.S.C.
§ 1677b(c)(1)(B) that normal value include amounts for "general
expenses and profit," Commerce "usually calculates separate

_____

        [14]    As plaintiffs point out, "the calculated wage rate of
$0.93/hour is more than 600% higher than India's published,
country-wide labor rate of $0.15/hour."  Issues & Dec. Mem. at
25.

values for selling, general and administrative [("SG&A")]

expenses, manufacturing overhead and profit, using ratios[15]

derived from financial statements of one or more companies that

produce identical or comparable merchandise in the surrogate

country." *Shanghai Foreign Trade*, 28 CIT at __, 318 F. Supp. 2d

at 1341.


Here, Commerce determined that data from Mahabaleshwar Honey

Production Cooperative Society Ltd.'s ("MHPC") 2003-2004

financial statement was the "best available information" from

which to derive surrogate financial ratios.[16]  In choosing to

---

[15]    As this Court explained in *Shanghai Foreign Trade*,

> [t]o calculate the SG & A ratio, the Commerce
> practice is to divide a surrogate company's
> SG & A costs by its total cost of
> manufacturing.  For the manufacturing
> overhead ratio, Commerce typically divides
> total manufacturing overhead expenses by
> total direct manufacturing expenses.
> Finally, to determine a surrogate ratio for
> profit, Commerce divides before-tax profit by
> the sum of direct expenses, manufacturing
> overhead and SG & A expenses.   These ratios
> are converted to percentages ("rates") and
> multiplied by the surrogate values assigned
> by Commerce for the direct expenses,
> manufacturing overhead and SG & A expenses.

*Id.* at __, 318 F. Supp. 2d at 1341 (citing Manganese Metal From
the PRC, 64 Fed. Reg. 49,447, 49,448 (Dep't of Commerce Sept. 13,
1999) (final results)).

[16]    MHPC, a cooperative, "is in the business of buying raw
honey from its members and selling processed honey to its
                                                (continued...)

rely on the MHPC financial statement, it rejected the financial

statement of Apis (India) Natural Products ("Apis"), a honey

supplier:

> With respect to quality, we find that MHPC is
> a better source of data than Apis because the
> MHPC materials include a complete annual
> report, an auditors report, and complete
> profit and loss business statements that
> segregate MHPC's honey and fruit canning
> businesses.  With respect to specificity, we
> note that MHPC is a honey processor in India,
> and the financial statements include details
> on MHPC's costs and revenues related to its
> honey processing business.  The MHPC
> statement is also contemporaneous to the
> POR . . . .  In contrast, we find that the
> Apis statement does not include any auditor
> notes, nor does it appear to include complete
> schedules or details on Apis' operations.
> Therefore, we are not using the Apis data
> because we determine that it is not as
> reliable or detailed as that of MHPC, and
> because we have other publicly available
> information which meets the Department's
> criteria for data on which to base the
> surrogate financial ratios.

Issues & Dec. Mem. at 17.  Thus, Commerce concluded the MHPC

financial statement was more reliable than the Apis financial

statement and used the data in the MHPC financial statement to

derive the financial ratios.


When calculating the ratio for manufacturing overhead, it

was necessary to include the cost of raw honey used in making

---

[16](...continued)
customers . . . ."  Issues & Dec. Mem. at 18.

processed or finished honey.  The MHPC financial statement,

however, did not include a raw material cost for honey.

Accordingly, Commerce extrapolated the raw material cost, using

the following methodology:

> [The] raw material cost was derived by
> dividing the total cost of honey by the
> quantity [MHPC] purchased [from its members]
> and then multiplying this figure by the sum
> of the quantities [MHPC] sold [to its
> customers] and lost during production.

Issued & Dec. Mem. at 18.  Commerce included the cost of raw

materials as a component of direct manufacturing costs.  *See*

Factors of Production Valuation Mem. for the Final Results, Pub.

Doc. 340, Attach. II (Surrogate Financial Ratios).


    Plaintiffs argue that: (1) Commerce's use of the MHPC

financial statement was unreasonable because it did not include a

figure representing the raw material cost for honey; and (2) the

methodology Commerce used to extrapolate the raw material cost

for honey is flawed because it is based on unsupported

assumptions.  Pls.' Mem. 37-38.


    First, plaintiffs claim that without "separate opening and

closing raw materials inventories or [an] indicat[ion] [of] the

amount of honey processed during the reported accounting period,"

the MHPC financial statement is incomplete on its face.  Pls.'

Mem. 37.  Plaintiffs contend that the absence of this information

makes Commerce's decision to use the MHPC financial statement

unreasonable.


Second, the methodology Commerce used to extrapolate the raw

material cost for honey, plaintiffs claim, is based on

unsupported assumptions.  According to plaintiffs:

> In the absence of . . . data [on either the
> opening and closing raw materials inventories
> or the amount of honey processed during the
> reported accounting period], Commerce assumed
> [1] any raw honey processed from opening
> period inventory was valued at the price of
> raw honey purchased during the [reported
> accounting period].  Commerce further assumed
> [2] all honey sold during the [reported
> accounting period] was processed during the
> [reported accounting period].
>
> Commerce's calculation of financial ratios is
> predicated on these assumptions.  However,
> there is nothing in the MHPC Financials to
> support these assumptions, as opposed to
> alternative assumptions that honey consumed
> from inventory to process finished honey was
> priced higher or lower than purchased raw
> honey or that MHPC processed more honey than
> it sold during the [reported accounting
> period] or less than it sold – any of which
> would radically change the surrogate
> financial ratios.  As such it was impossible
> for Commerce to calculate accurate, actual
> surrogate financial ratios from the MHPC
> Financials.

Pls.' Mem. 37-38.  In other words, plaintiffs charge that the

MHPC financial statement does not support the assumptions that

(1) the cost of raw honey (if any) taken from MHPC's inventory

was the same as later purchased raw honey; and that (2) all of

the honey MHPC sold during the reported accounting period was
processed during that period.  Commerce would not have had to
make these assumptions, plaintiffs argue, had it used the Apis
financial statement.

Plaintiffs also argue that the MHPC financial statement
lacks a report indicating it is in accordance with Indian
Generally Accepted Accounting Principles ("GAAP").  Pls.' Mem.
38-39.  Plaintiffs argue that as a cooperative, MHPC is not
required to report its financial statements in accordance with
the Indian GAAP.  Pls.' Mem. 39.  They further contend that Apis
is so required, and "therefore its auditor's report illustrates
that the statements are reliable as in accordance with the
financial/accounting standards of India."  Pls.' Reply 13 n.18.
Plaintiffs thus seek a remand to Commerce with instructions to
use the Apis financial statement to calculate the surrogate
values for factory overhead, SG&A expenses and profit.

For its part, defendant contends Commerce's use of the 2003-
2004 MHPC financial statement to derive surrogate financial
ratios was reasonable because the statement was contemporaneous
with the POR and included complete and detailed information
regarding MHPC's financial and business operations.  Def.'s Opp'n
35-36.

Next, defendant argues that the methodology Commerce used to
extrapolate the cost of raw materials consumed is reasonable.
First, defendant contends that the methodology "is consistent
with [the antidumping statute,]$^{17}$ which permits Commerce to
allocate costs and make adjustments where the reported costs do
not reasonably reflect the costs associated with the subject
merchandise."  Def.'s Opp'n 37; *see also* Issues & Dec. Mem. at
18.  Second, defendant states: "[R]espondents have cited no
specific evidence that the derived MHPC raw material cost of
honey is distortive."  Def.'s Opp'n 37 (quoting Issues & Dec.
Mem. at 18).  Finally, with respect to plaintiffs' argument that
the MHPC financial statement is not GAAP compliant, defendant
contends that plaintiffs' argument is barred because it was not
previously raised before Commerce.  Def.'s Opp'n 32; *see also*
Def.-Ints.' Opp'n 30.

The court finds that Commerce was justified in determining
that the 2003-2004 MHPC financial statement was the best
available information to value factory overhead, SG&A expenses
and profit.  It is apparent from the Final Results that Commerce
examined both the MHPC and Apis financial statements and compared

---

[17]    In its opposition brief, defendant incorrectly cites 19
U.S.C. § 1677a(c), which pertains to adjustments for export price
and constructed export price.  The court presumes that defendant
intended to cite 19 U.S.C. § 1677b(f).

their quality, specificity and contemporaneity.  It then

concluded based on this examination that "the Apis financial

statement . . . is not a reliable source for calculating the

surrogate financial ratios because it is neither complete, nor

sufficiently detailed to provide a reliable source for surrogate

values."  Issues & Dec. Mem. at 17.  As Commerce observed, "the

Apis statement does not include any auditor notes, nor does it

appear to include complete schedules or details on Apis'

operations."  *Id*.  The MHPC's statement, on the other hand,

"include[s] a complete annual report, an auditors report, and

complete profit and loss and business statements that segregate

MHPC's honey and fruit canning businesses."  Issues & Dec. Mem.

at 17; Factors of Production Valuation Mem. for the Final

Results, Pub. Doc. 340, Attach. II.  Unlike Apis's statement,

MHPC's statement details its honey operations with both narrative

text and schedules indicating, for example, the number of

kilograms of honey produced by particular MHPC members and the

price per kilogram.  *See* Rebuttal to Pet'r Surrogate Data, Pub.

Doc. 265, Attach. 1.  The court thus finds that Commerce's

determination that the MHPC financial statement was the best

available information to value financial ratios was reasonable.


     While Commerce reasonably found the MHPC's financial

statement to be more reliable than Apis's, as has been noted, the

MHPC financial statement lacks a figure representing the raw
material cost for honey.  In the absence of this data, Commerce
extrapolated the data using a methodology, which it expressed
mathematically as follows: total cost of honey purchased during
MHPC's reporting year, i.e., April 1, 2003, to March 31, 2004
(2,598,344 Rs.)/quantity purchased during that year (29,433.80
kg.) X the sum of the quantities sold and lost during production
during that year (40,540.20 Rs.) = 3,578,789.88 Rs.  *See* Factors
of Production Valuation Mem. for the Final Results, Pub. Doc.
340, Attach. II.  The court will sustain Commerce's chosen
methodology "[a]s long as the agency's methodology and procedures
are reasonable means of effectuating the statutory purpose, and
there is substantial evidence on the record supporting the
agency's conclusions . . . ."  *Ceramica Regiomontana, S.A.*, 10
CIT at 404-05, 636 F. Supp. at 966; *Shakeproof Assembly
Components*, 268 F.3d at 1382 ("[T]he critical question is whether
the methodology used by Commerce is based upon the best available
information and establishes antidumping margins as accurately as
possible.").

    The court finds reasonable Commerce's methodology for
determining the raw material cost of honey.  First, while
plaintiffs complain that the methodology was unsupported by the
record, they do not propose an alternative methodology.  Second,

Commerce's use of the methodology was not unreasonable because it

resulted in Commerce's use of prices that are closest in time to

the POR.  Issues & Dec. Mem. at 17 ("[I]t is the Department's

established practice to select the most contemporaneous surrogate

values to value the factors-of-production and financial

ratios.").

     With respect to plaintiffs' GAAP argument, the court finds

it is barred because it was not raised before the agency.  Title

28 U.S.C. § 2637(d) provides that "the Court of International

Trade shall, where appropriate, require the exhaustion of

administrative remedies."  *Id*.  The doctrine of exhaustion is not

an absolute requirement in Commerce cases; it is left to this

Court to determine when exhaustion is appropriate.  *Koyo Seiko*

*Co. v. United States*, 26 CIT 170, 175, 186 F. Supp. 2d 1332, 1338

(2002); *Carpenter Tech. Corp. v. United States*, 30 CIT __, __,

452 F. Supp. 2d 1344, 1346 ("[E]xhaustion is generally

appropriate in the antidumping context because it allows the

agency to apply its expertise, rectify administrative mistakes,

and compile a record adequate for judicial review – advancing the

twin purposes of protecting administrative agency authority and

promoting judicial efficiency.") (citation omitted).  "Failure to

allow an agency to consider the matter and make its ruling

deprives the agency of its function and results in the court

usurping the agency's power as contemplated by the statutory

scheme." *China First Pencil Co. v. United States*, 30 CIT __, __,

427 F. Supp. 2d 1236, 1244 (2006) (citations omitted).

Plaintiffs make no argument that an exception to this rule

applies, e.g., where administrative consideration would be

futile, or the issue raised is a pure question of law. *See,*

*e.g., id.; Consol. Bearings Co. v. United States*, 348 F.3d 997,

1003 (Fed. Cir. 2003) (where "[s]tatutory construction alone

[was] not sufficient to resolve this case," the case "[did] not

qualify for the 'pure question of law' exception to the

exhaustion doctrine'").


     Plaintiffs raise for the first time the issue of GAAP

compliance in support of its argument that the MHPC financial

statement is not as reliable as the Apis financial statement.

While plaintiffs presented their other arguments with respect to

the reliability of the MHPC financial statement at the

administrative proceeding, they failed to raise this argument.

Thus, because this issue was not raised before Commerce it is

barred by the exhaustion of remedies doctrine. *See Carpenter*

*Tech. Corp.*, 30 CIT at __, 452 F. Supp. 2d at 1346 (finding

plaintiff failed to exhaust administrative remedies on issue of

collapsing where plaintiff failed to raise the issue before

Commerce).  Therefore, the court shall not consider plaintiffs'

GAAP argument.


III. Commerce's Calculation of Plaintiffs' Assessment Rate and
     Cash Deposit Rate

     The court next turns to plaintiffs' challenge to Commerce's

method of calculating cash deposit and assessment rates.  In the

Final Results, Commerce "determined that, with respect to the

antidumping duty order on honey from the PRC, *per-kilogram*

antidumping duty cash deposit and assessment rates are

appropriate."  Issues & Dec. Mem. at 30 (emphasis added).


     Plaintiffs contend that "[t]hroughout the prior annual

reviews and new shipper reviews on honey, Commerce's practice was

to base its assessment rate and cash deposit rate upon an *ad

valorem* basis."  Pls.' Reply 14.  Yet, "after all case briefs and

rebuttal briefs had been filed, and the record closed . . .

Commerce requested comments regarding a possible revision to

Commerce's standard methodology for calculating assessments and

cash deposits, from an *ad valorem* basis to a per kilogram basis,"

and allowed "less than two days for commenting on the issue,

denying Wuhan an opportunity to fully review and comment on [the]

issue."  Pls.' Mem. 42.  Plaintiffs argue that "'principles of

fairness prevent Commerce from changing its methodology at this

late stage {and} Commerce is required to administer the

antidumping laws fairly.'"  Pls.' Reply 14 (quoting *Shikoku Chem.*

*Corp. v. United States*, 16 CIT 382, 388, 795 F. Supp. 417, 421 (1992)).

Defendant responds that while Commerce's regulations "provide for the agency to 'normally'[18] calculate the assessment rate upon an *ad valorem* basis," the "regulation **does not require** Commerce to calculate the assessment rate on an *ad valorem* basis." Def.'s Opp'n 38, 39 (emphasis in original). With respect to the amount of time given to the parties to comment on the proposed use of a per kilogram methodology, defendant asserts that "Wuhan could have requested an extension of time, but did not." Def.'s Opp'n 40. Thus, defendant urges the court to sustain Commerce's decision to apply an assessment rate and the

---

[18]  Title 19 C.F.R. § 351.212 states that "normally" the assessment rate will be based on the entered value of merchandise.  Entered value is not, however, the sole means by which Commerce may calculate assessment rate:

> If the Secretary has conducted a review of an antidumping order under § 351.213 (administrative review), . . . the Secretary normally will calculate an assessment rate for each importer of subject merchandise covered by the review.  The Secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes.  The Secretary then will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise.

19 C.F.R. § 351.212(b)(1).

cash deposit rate on a per kilogram basis.

Here, because (1) Commerce used the *ad valorem* methodology
to calculate such rates in the first annual review and new
shipper reviews on honey,[19] and (2) Commerce asked for comments
on a possible change from an *ad valorem* to a per kilogram basis
late in the course of this review, i.e., after the record was
closed, the court finds that Commerce unreasonably restricted the
time in which the parties could comment to two days.[20]  While the
regulations do not require Commerce to use the *ad valorem* method
in all situations, as evidenced by the word "normally,"
considerations of fairness favor allowing plaintiffs more time to
respond to Commerce's proposed change in methodology after having
used the *ad valorem* methodology in this and prior reviews.  As

---

[19]     *See, e.g.*, Honey from the PRC, 68 Fed. Reg. 69,988,
69,994 (Dep't of Commerce Dec. 16, 2003) (prelim. results of
first antidumping duty admin. rev.) ("[T]he Department will issue
appraisement instructions directly to CBP to assess antidumping
duties on appropriate entries by applying the assessment rate to
the entered value of the merchandise."); Honey from the PRC, 69
Fed. Reg. 69,350, 69,356 (Dep't of Commerce Nov. 29, 2004)
(notice of prelim. results of new shipper revs.) ("[W]e will
calculate importer-specific *ad valorem* duty assessment rates
based on the ratio of the total amount of the dumping margins
calculated for the examined sales to the total entered value of
those same sales.").

[20]     By letter dated May 24, 2005, Commerce requested
comments from the interested parties regarding its proposed
revision to the assessment and cash deposit methodology by the
close of business on May 26, 2005.  Letter from Commerce to All
Interested Parties of 5/24/05, Pub. Doc. 317 at 1.

noted in the Final Results, Commerce's decision to use a per

kilogram methodology here was based on its finding that "there

can be a substantial difference between the U.S. sales price for

honey and the average entered value reported to U.S. Customs and

Border Protection."  Issues & Dec. Mem. at 30.  This finding led

Commerce to conclude that it "[was] unable to calculate *ad*

*valorem* cash deposit rates that [would] ensure the collection of

total antidumping duties due."  *Id*.  Commerce reached its

decision, however, without adequate time being allotted for

either the giving of comments or for consideration of comments.

As a result, plaintiffs were prejudiced by the Department's

actions.  *See Sea-Land Serv., Inc. v. United States*, 14 CIT 253,

257, 735 F. Supp. 1059, 1063 (1990) (requiring a showing that

procedural errors by the agency "'were prejudicial to the party

seeking to have the action declared invalid'") (citations

omitted), *aff'd and adopted*, 923 F.2d 838 (Fed. Cir. 1991).  The

court thus finds that on remand plaintiffs shall have the

opportunity to submit further comments on whether Commerce should

calculate assessment and cash deposit rates on an *ad valorem*

basis or a per kilogram basis, in light of Commerce's concern

that it would be unable to "ensure the collection of total

antidumping duties due."  *Id*.  Furthermore, plaintiff shall be

allowed to place evidence on the record, should it find it

necessary to do so, specifically with respect to how an *ad*

Court No. 05-00438                                           Page 56

*valorem* methodology furthers, or does not further, the collection

of total duties owed.  Finally, Commerce must fully explain its

decision to use a per kilogram or *ad valorem* methodology by

reference to evidence placed on the record.


                              CONCLUSION

     For the forgoing reasons, the court sustains the Final

Results in part and remands for further action consistent with

this opinion.  Remand results are due October 20, 2007.  Comments

to the remand results are due November 20, 2007.  Replies to such

comments are due December 4, 2007.


                                        /s/ Richard K. Eaton
                                        Richard K. Eaton


Dated:     July 20, 2007
           New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                            Deputy Clerk